MRS. ELEANOR CRUCE, GDN. *v*. ARK. STATE HOSPITAL

5-4068                                            409 S. W. 2d 342

Opinion delivered December 19, 1966

*James A. Ross* and *James A. Ross Jr.*, for appellant.

*Clifton Bond* and *Pope, Pratt, Shamburger, Buffalo & Ryan*, for appellee.

CARLETON HARRIS, Chief Justice. This appeal relates to the validity of claims filed by the Arkansas State Hospital against the estate of Mrs. Hattie Martin. incompetent. Corporal Alex Martin, a native of Drew County, Arkansas, was serving with the armed forces when the Japanese invasion of the Philippine Islands occurred. Martin was captured in the islands by the Japanese, and died in a prison camp on November 22,

1942. He was the son of D. G. Martin, who died about 1930, and Mrs. Hattie Martin, who is an incompetent ward at the Arkansas State Hospital, having been confined there since about 1933. Corporal Martin was unmarried, had no children, and was survived by the mother and one brother, Elgin, a resident of Drew County. Several persons have served as guardians for Mrs. Martin, and the current guardian, Mrs. Eleanor Cruce, was appointed on June 16, 1958. In 1962, appellant's attorney, James Ross, undertook the recovery of monies believed to have been deposited by Alex Martin at the Albuquerque National Bank in Albuquerque, New Mexico. After correspondence and the filing of necessary papers, Mrs. Cruce, as guardian of Mrs. Martin, was forwarded a check in the sum of $1,450.00, representing the bank account of Alex Martin. In 1963, the guardian applied to the Veterans Administration for benefits that might be due by reason of Corporal Martin's military service, and awards were subsequently made as hereinafter set out.

In 1942, Public Law 667 of the 77th Congress, 56 Stat. 657 was passed, amending the National Service Life Insurance Act (NSLIA) as follows:

"(B) Any person in the active service who on or after December 7, 1941, and prior to April 20, 1942, has been or shall be captured, besieged, or otherwise isolated by the forces of an enemy of the United States for a period of at least thirty consecutive days and extending beyond April 19, 1942, and at the time of such capture, siege or isolation by the enemy did not have in force insurance in the aggregate amount of at least $5,000 under the War Risk Insurance Act, as amended, the World War Veterans' Act, as amended, or this Act, shall be deemed to have applied for and to have been granted, effective as of the date of such capture, siege, or isolation, National Service Life Insurance in an amount which together with any such insurance then in force shall aggregate $5,000 of insurance, and such insurance shall remain in force and premiums on such insurance shall

be waived during the period while such person remains so captured, besieged, or isolated, and for six months thereafter:''

Under the present provisions of the NSLIA[1] Mrs. Cruce, as guardian of Mrs. Martin, received in August, 1964, the sum of $7,347.15 from the Veterans Administration. This lump sum payment was made to take care of all back payments due under Public Law 667, and represented the sum of $28.15 per month from the date of the death of Corporal Martin.[2] An award was also made by the Veterans Administration to Mrs. Martin of $75.00 per month, because she was a dependent of the deceased veteran, and the monthly payments under this award commenced on March 1, 1964.

In the meantime, the Arkansas State Hospital had started, on September 25, 1955, filing claims with the guardian of the estate of Hattie Martin for maintenance. On this date claims were filed for maintenance at the rate of $50.00 per month from September 1, 1955, to March 1, 1958, for a total of $1,500.00, and at the rate of $90.00 per month from March 1, 1958, to September 1, 1958, for the sum of $540.00, or a total claim of $2,040.00. A second claim was filed against the estate at the rate of $90.00 per month from September 1, 1958, to January 1, 1963, for a sum of $4,590.00, and a third claim was filed covering the period from January 1, 1963, to January 1, 1965, in the amount of $2,160.00. The total bill claimed against the estate is $8,790.00. After several separate hearings, the court held that the estate was liable to the hospital for claims filed from March 1, 1958, and allowed amounts totaling $6,750.00. From the judgment so entered, appellant brings this appeal. Appellee cross-appeals from the court's failure to allow the full amount sought. Several points are urged by appel-

[1]72 Stat. 1151 (1958), 38 U. S. C. § 716 (1964).

[2]The guardian for Mrs. Martin selected an optional settlement which guaranteed the amount of $28.15 monthly for a minimum period of ten years, and further provided that that sum would be paid for the remainder of Mrs. Martin's life.

lant for reversal, and we proceed to discuss these alleged errors, though not necessarily in the order listed.

It is asserted that the hospital claim is barred by the statute of limitations, but we have held to the contrary. See *Alcorn* v. *Arkansas State Hospital*, 236 Ark. 665, 367 S. W. 2d 737. It is further contended that appellee did not comply with Ark. Stat. Ann. § 59-230 (1947). Pertinent portions of that section provide as follows:

"If any patient admitted to the State Hospital be found, upon examination, to possess an estate, over and above all indebtedness, more than sufficient for the support of his or her dependents, his or her natural or legally appointed guardian shall pay out of such estate into the office of the business manager of the State Hospital, in advance, an amount equal to one [1] month's maintenance, at a rate to be fixed by the Board of Control [State Hospital Board] from time to time on the basis of maintenance costs, and in addition, shall supply the patient with sufficient and suitable clothing, and shall remove said patient when so required and notified by the Superintendent. If the patient remains in the State Hospital more than one [1] month, such payments shall be made, monthly in advance, for the whole period during which the patient remains in the State Hospital. If the patient has no such estate of his own, then his obligation shall exist against any person who is legally bound to support such patient. * * *

"The business manager, following the admission of a patient into the State Hospital, shall make an investigation to determine the extent of the estate, if any, owned by the incompetent patient, and whether he has a duly appointed and acting guardian to protect his property and his property interest. The business manager shall also make an investigation to determine whether the patient has any relative or relatives legally responsible for the payment of maintenance, and shall ascertain the financial condition of such relative or rela-

tives to determine whether in each case such relative or relatives are in fact financially able to pay such charges. All reports in connection with such investigations, together with the findings of the business manager, shall be kept in the Business Office and may be inspected by interested relatives, their agents, or representatives at any time upon application."

Appellant cites the case of *Arkansas State Hospital* v. *Kestle*, 236 Ark. 5, 364 S. W. 2d 804, in support of her argument that an investigation is required prior to any liability. That case, as well as *Alcorn* v. *Arkansas State Hospital, supra,* only dealt with procedure where a patient had no estate of his own, and recovery was sought against persons having the legal obligation of support. The section seems to primarily relate to the duty of the business manager of the hospital to make an investigation as a matter of determining if the patient is able to pay for his or her maintenance in advance. Of course, the requirement that reports in connection with investigations be filed in the business office for the inspection of interested relatives is for the benefit of a guardian or person responsible for the maintenance of the patient who might dispute that the estate (or relative) had sufficient monies to provide maintenance for the patient. The report would enable such a person to determine where the hospital received its information, and to point out any discrepancies or errors in the report. In the case before us, though filing claims, the State Hospital never made any effort to enforce payment against either the estate or relative, so no one has been prejudiced by the failure to file reports back in the 1950's. Undoubtedly, the business manager of the hospital did not push the matter of enforcement during that period, because he knew the estate did not possess the requisite amount of funds. For that matter, an investigation was conducted in 1958, for a letter appears in the record wherein the hospital inquired of the guardian of Mrs. Martin, as to the financial status of the estate. The statute referred to, of course, does not negate the liability of the estate. It might also be mentioned that, fol-

lowing our holding in *Arkansas State Hospital v. Kestle, supra,* the General Assembly of the State of Arkansas enacted Act No. 266 of the Acts of 1963 [Ark. Stat. Ann. § 59-230.2 (Supp. 1965)], which appears to have nullified at least a part of that opinion. We find no merit in this contention.

The main issue is whether the money received under the NSLIA is exempt from seizure under judicial process by reason of our own statute, Ark. Stat. Ann. § 30-208 (Repl. 1962), the pertinent portions of which provide as follows:

"All moneys paid or payable to any resident of this state as the insured or beneficiary designated under any insurance policy or policies providing for the payment of life, sick, accident and/or disability benefits shall be exempt from liability or seizure under judicial process of any court, and shall not be subjected to the payment of any debt by contract or otherwise by any writ, order, judgment, or decree of any court * * *."

Appellant asserts that the money obtained under the NSLIA is exempt from claim or debt, because it is derived from insurance, while appellee just as stoutly contends that the proceeds were not paid under an "insurance policy" as defined by § 30-208. At the time the state statute was enacted (1933), the NSLIA was not in existence. Counsel for each side present excellent briefs, but state that they have found no cases relating to the federal act which discuss the question here presented.

Appellee, in its brief, discusses the various meanings of the word "insurance." Among others, it mentions that found in 44 C. J. S., Section 25, Page 484:

"Life insurance is a mutual agreement by which one party agrees to pay a given sum on the happening of a particular event contingent on the duration of human life, in consideration of the payment of a smaller sum

immediately, or in periodical payments by the other party. * * * ''

Appellee emphasizes that a policy of insurance is a written agreement between two parties whereby the insurer agrees that, on the payment of premiums by the insured, the insurer will pay a certain sum upon the happening of a certain event. It is pointed out that National Service Life Insurance embodies all the characteristics of commercial life insurance, i. e., a serviceman makes an application designating the amount of insurance and the beneficiary; the application is processed and approved; a certificate of insurance is issued; and a stipulated premium is paid each month by the serviceman. Appellee states:

''In the instant case Corporal Alex Martin, deceased, never made a written application for National Service Life Insurance, there was never an agreement between him and the United States, whereby the Government agreed for a stipulated premium to pay a certain sum in the event of the serviceman's death and a policy or certificate of insurance was never issued by the United States.

It is merely provided that under Public Law 667 of the 77th Congress, that as between the Government, the serviceman and the statutory beneficiaries (after the death of the serviceman) there was in existence a statutory contract of insurance termed 'National Service Life Insurance,' upon which the beneficiary could maintain a claim against the Government in the event of the death of the serviceman.''

We do not agree with this contention. While, as stated, no cases have been mentioned to us (and we have found none), which relate to an interpretation of the point involved in the federal statute, here discussed, there are decisions relating to a somewhat similar act. A statute was passed in 1917, relative to persons serving in World War I. This act, known as the War Risk In-

surance Act, contained a section (Section 401, 40 Stat. 409) providing "automatic" insurance, said section reading in part, as follows:

"Any person in the active service on or after the sixth day of April, 1917, who, while in such service and before the expiration of one hundred and twenty days from and after such publication, becomes or has become totally and permanently disabled or dies, or has died, without having applied for insurance, shall be deemed to have applied for and to have been granted insurance * * *."

The federal courts were asked several times to determine whether this World War I automatic insurance was an insurance contract. In *United States* v. *Jackson,* 89 F. 2d 572, (Fourth Circuit) the court stated:

"The basic contention * * * with regard to the first point is that the automatic insurance provided by the War Risk Insurance Act was a gratuitous death or disability allowance and not a contract. It is pointed out that the insured paid no premiums and received no written certificate or policy of insurance, and hence it is said that the provisions of the act come within the scope of Section 17 of the Economy Act, which repealed 'all public laws granting medical or hospital treatment, domicillary care, compensation and other allowances, pension, disability allowance, or retirement pay to veterans and the dependents of veterans of the * * * World War.' "

Further:

"It is obvious that Congress chose to consider the induction of the soldier into the service and his disability or death within 120 days thereafter as equivalent to an application for and a grant of insurance, so that a contract of insurance of equal validity to those for which applications should be made would come into existence; and since Congress accepted the military service as the basis of the contract, it is of no moment that no written document was issued to the soldiers * * *."

Likewise, in *Cunningham* v. *United States*, 67 F. 2d 714 (1933), the Federal Circuit Court of Appeals said of automatic insurance:

"\* \* \* It is true that the grant is a gratuity in the sense that no premium is exacted of the soldier whose case it fits; but this is the only sense in which it is true. What is granted is a contract of insurance, having in all other respects than the requirement of premiums the same incidents, entitling the holder to the same rights and remedies, and governed by the same rules as contracts of insurance issued on applications and with the payment of premiums. The place where the language is found, the fact that it is an integral part of the act granting war risk insurance, the language itself 'any person \* \* \* shall be deemed to have applied for and to have been granted insurance,' under the plainest principles of statutory construction compels this conclusion. Any other would do the greatest violence to the act. Indeed, the matter is so plain that the suability of these contracts has been assumed without question. [Citing cases.]"

Similar decisions could also be cited. These holdings are quite persuasive in the instant litigation, for it is apparent that the pertinent sections in the two acts were enacted for the same purpose, *i.e.*, the protection of the individual in the armed forces (and his family) who never had an opportunity to apply for service life insurance. In the case before us, the act repeatedly terms the coverage, here under discussion, "insurance," provides for a waiver under certain conditions (as in many insurance policies), gives an option for manner of payment preferred, and actual payments to the beneficiary are made as under an insurance policy. We hold that the coverage afforded Corporal Alex Martin was insurance.

In addition to the aforementioned argument, appellee argues that, even though the money paid to the guardian be held to have been derived from insurance, still such proceeds are not exempt from the hospital's

claim (as appellant contends) by virtue of Section 30-208 of our statutes. The basis of this argument is that Mrs. Martin's debt to the hospital is not a "debt by contract or otherwise;" rather, it is contended that the debt is based upon statute, and is therefore simply a statutory claim. It is not necessary that we discuss whether Mrs. Martin's maintenance by the hospital is based upon a contract, for we are firmly convinced that the words "or otherwise" exempt the insurance money from the claim. In *Ponder* v. *Jefferson Standard Life Insurance Company*, 194 Ark. 829, 109 S. W. 2d 946, in referring to the statute under discussion, we said:

"The statute exempts from seizure under judicial process 'any debt by contract or otherwise.' *This language exempts all debts of whatever nature and in whatsoever manner incurred.* (Emphasis supplied)"

However, we do not agree with appellant that all payments received from the federal government by the guardian of Mrs. Martin are exempt from the claim for maintenance by the State Hospital. Here, we have reference to the $75.00 per month benefit awarded Mrs. Martin as a dependent of Corporal Alex Martin.[3] The pertinent statute is 72 Stat. 1229 (1958), 38 U. S. C. § 3101 (1964), which provides that:

"* * * (a) Payments of benefits due or to become due under any law administered by the Veterans' Administration shall not be assignable except to the extent specifically authorized by law, and such payments made to, or on account of, a beneficiary shall be exempt from taxation, shall be exempt from the claim of creditors, and shall not be liable to attachment, levy or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary. * * *

We agree with the Drew County Probate Court that

[3]The exact authority for this award is not shown in the transcript or briefs, but same was apparently made under 72 Stat. 1122 (1958), 38 U. S. C. §§ 321-322 (1964), which includes a dependent parent.

the position of the Wisconsin Supreme Court in the case of *In re Bemowski's Guardianship*, 3 Wis. 2d 133, 88 N. W. 2d 22 (1958) is sound and logical, and we adopt that court's view.

From that opinion:

"We will first consider the effect of the federal exemption statute independently of our own state exemption statute. Said sec. 454a, Title 38 [now 38 U. S. C. § 3101], at the times material to this appeal, provided in part as follows:

" 'Payments of benefits due or to become due shall not be assignable, and such payments made to, or on account of, a beneficiary under any of the laws relating to veterans shall be exempt from taxation, shall be exempt from the claims of creditors, and shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary.'

"In *Lawrence* v. *Shaw*, 1937, 300 U. S. 245, 57 S. Ct. 443, 81 L. Ed. 623, 108 A. L. R. 1102, the United States Supreme Court considered the application of the exemption provided in sec. 454a to pension benefits of a veteran, which benefits were attempted to be subjected to tax. In the opinion of the court, Chief Justice Hughes made this significant statement (300 U. S. at page 250, 57 S. Ct. at page 445):

" 'These payments are intended primarily for the maintenance and support of the veteran.' * * *

"Therefore, in interpreting sec. 454a, the question is whether Congress intended to classify the state as a *'creditor'* within the terms of such statute. The courts of California, Michigan and New York in a number of well reasoned opinions have held that Congress did not intend to classify states, which have provided support in state institutions to incompetent veterans under guardianship as *'creditors'* * * * [*Cases cited*]

"We adopt the reasoning of the Michigan court so well stated by Mr. Chief Justice Wiest in In re Lewis' Estate, supra, as follows (287 Mich. at page 186, 187, 283 N. W. at page 24):

" 'We are not here concerned with actions by creditors seeking to turn the pension to satisfaction of their demands, but only with the question of reimbursement of the state for care and maintenance. Certainly the pension protective law does not intend the fund for the welfare of the beneficiary and then, under restrictions thereof, after receipt by the beneficiary, prevent employment thereof for care and support of the pensioner. * * *

" 'The state, under humanitarian legislation, has assumed the care and maintenance of the insane pension beneficiary and, by statute, has provided means and measures for reimbursement and we do not think that, under such circumstances, Congress intended to consider the state in the class of barred creditors. The exemption in the pension law serves its purpose in holding that in the hands of the guardian and under order of the court, of which the beneficiary is a ward, the money is not exempt from employment in reimbursing the state, under statutory provisions, for the expense of care and maintenance of the ward.' "

We hold that these funds are not exempt from the claims of the State Hospital.

As to the cross-appeal, our holding under Point One settles that issue. We have said that the statute of limitations does not run against these claims, and we have shown why Ark. Stat. Ann. § 59-230 (1947) is not applicable to the situation here presented. We think the court erred in refusing to allow the claim from September 1, 1955, to September 1, 1958, in the amount of $2,040.00.

Summarizing, we hold that the court erred in find-

ing that the monies received under Public Law 667 of the 77th Congress did not constitute proceeds from insurance; further, we hold that the court erred in not granting the State Hospital claim from September 1, 1955, to September 1, 1958. Because of these errors, the cause is remanded to the Drew Probate Court with directions to enter an order not inconsistent with this opinion. In all other respects, the judgment is affirmed.